James Hawkins, SBN 192925
james@jameshawkinsaplc.com
Gregory Mauro SBN 222239
greg@jameshawkinsaplc.com
JAMES HAWKINS, APLC
9880 Research Drive, Suite 200
Irvine, CA. 92618
Tel: 949-387-7200

Kevin J. Stoops (*pro hac vice forthcoming*)
kstoops@sommerspc.com
Charles R. Ash IV (*pro hac vice forthcoming*)
crash@sommerspc.com
SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Telephone: (248) 355-0300

*Counsel for Plaintiffs and Proposed Class and Collective Members*

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

| | |
|---|---|
| **MONIQUE DUDLEY** and **NOREEN COSTA**, individually and on behalf of all other similarly situated, | Case No.: |
| Plaintiffs, | |
| v. | **FLSA COLLECTIVE ACTION/ CLASS ACTION COMPLAINT AND JURY DEMAND** |
| **TRUECOVERAGE LLC**, as | |
| Defendant. | |

Plaintiffs, Monique Dudley and Noreen Costa (hereinafter "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, hereby bring this Collective/Class Action Complaint against Defendant TrueCoverage, LLC. (hereinafter Defendant), and state as follows:

## INTRODUCTION

1.     This is a collective and class action brought for violations of the Fair Labor Standards Act of 1938, 29 U.S.C. § 201, *et seq.* ("FLSA"); California Labor Code ("Labor Code"); the California Industrial Welfare Commission Wage Order No. 4; and the California Business & Professional Code section 17200, *et seq.*, as a FLSA § 216(b) collective action and California state-wide class action pursuant to Fed. R. Civ. P. 23(b)(3).

2.     Defendant is in the business of over-the-phone insurance sales for insurance companies to consumers, in an at-home call center setting, via inbound and outbound calls.

3.     As part of its business practices, Defendant generates their leads through marketing campaigns to entice consumers to enroll in insurance plans over the phone.

4.     In order to make and field these calls, Defendant employed insurance agents in an at-home call center setting (referred to herein as "Agents").

5.     As set forth herein, Defendant misclassified its Agents as independent contractors.

6.     Defendant required its Agents to work a full-time schedule, plus overtime. However, Defendant did not record its Agents' compensable work time as required by law.

7.     Instead of paying Agents based on hours worked, Defendant paid its Agents on a contingent, commission-only basis whereby Defendant paid commissions but then "charged back" their Agents for a return of any commissions (up to 100%) on sales that were cancelled within the first several months.

8.     Defendant's contingent, commission-only compensation system resulted in

COLLECTIVE & CLASS COMPLAINT AND JURY DEMAND

Agents not being paid for all time worked, including overtime.

9.     Defendant's Agents performed the same basic job duties and were required to use the same or similar computer networks, software programs, applications, and phone systems.

10.     The individuals Plaintiffs seek to represent in this action are current and former Agents who are similarly situated to themselves in terms of their positions, job duties, pay structure, and Defendant's violations of federal and state law.

11.     Defendant knew or should have known that Plaintiffs and the putative class members were properly classified as employees entitled to overtime premiums and minimum wage, and that they were not independent contractors.

12.     Plaintiffs seek a declaration that their rights, and the rights of the putative Class, were violated, an award of unpaid wages, an award of liquidated damages, injunctive and declaratory relief, attendant penalties, and award of attorneys' fees and costs to make them whole for damages they suffered, and to ensure that they and future workers will not be subjected by Defendant to such illegal conduct in the future.

## JURISDICTION AND VENUE

13.     This Court has subject-matter jurisdiction over Plaintiffs' FLSA claim pursuant to 29 U.S.C. §216(b), which provides that suit under the FLSA "may be maintained against any employer … in any Federal or State court of competent jurisdiction."

14.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a) because this claim arises from a common set of operative facts and is so related to the claims within this Court's original jurisdiction that they form a part of the same case or controversy.

15.     This Court has personal jurisdiction over Defendant because Defendant conducted business in this State, had systematic and continuous ties with this state, and had agents and representatives in this state.  Thus, Defendant has sufficient minimum contacts with or otherwise purposefully avail themselves of the markets in the State of

COLLECTIVE & CLASS COMPLAINT AND JURY DEMAND

California, or otherwise has sufficient contacts with this District to justify them being fairly brought into court in this District.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(d) because Plaintiffs and at least some of the putative Class members worked and were paid in this District and the obligations, liabilities, and breaches complained of herein arose or occurred in this District.  Defendant owns, operates, and/or maintains offices, transacts business, employs Agents within the District, or otherwise are found within the District. Defendant is within the jurisdiction of this Court for purpose of service of process.

## PARTIES

17.     Plaintiff, Monique Dudley, is a resident of Monrovia, California. She was formerly employed by Defendant as an Agent from October 18, 2017 until January 2, 2018.  At all relevant times, Plaintiff Dudley worked from her home in Monrovia, California. She has signed a consent form to join this collective action lawsuit, which is attached to this complaint as *Exhibit 1*.

18.     Plaintiff, Noreen Costa, is a resident of Burbank, California. She was formerly employed by Defendant as an Agent from November 7, 2017 until January 2, 2018.  At all relevant times, Plaintiff Costa worked from her home in Burbank, California. She has signed a consent form to join this collective action lawsuit, which is attached to this complaint as *Exhibit 2*.

19.     Additional individuals were or are employed by Defendant as Agents during the past four years and their consent forms will also be filed in this case.

20.     Defendant, TrueCoverage LLC, is a limited liability company incorporated in Delaware with a registered office address of 108 West 13th Street, Wilmington, Delaware 19801.  Defendant's principle place of business is located at 20121 Girard Blvd., Ste. 200, Albuquerque, New Mexico 87106.

21.     Upon information and belief, Defendant employed hundreds of Agents – including Plaintiffs – in California and other states during the last four years to perform services which include selling insurance products and services over the phone.

4

COLLECTIVE & CLASS COMPLAINT AND JURY DEMAND

22.     Plaintiffs are informed and believe, and allege thereon, that Defendant is responsible for the circumstances alleged herein, and proximately caused Plaintiffs and the general public to be subject to the fraudulent, unlawful, unfair, and deceptive acts and practices complained of herein.

23.     At all times herein mentioned, Defendant approved of, condoned, and/or otherwise ratified each and every one of the acts or omissions complained of herein.

24.     At all times herein mentioned, Defendant's acts and omissions proximately caused the complaints, injuries, and damages alleged herein.

## GENERAL ALLEGATIONS

25.     Plaintiff, Monique Dudley, was employed by Defendant as an Agent from her home in Monrovia, California from October 18, 2017 until January 2018.  In that position, she was compensated on a contingent, commission-only basis and typically worked 40 or more hours per week (and more than 8 hours per day).

26.     Plaintiff, Noreen Costa, was employed by Defendant as an Agent from her home in Burbank, California from November 7, 2017 until January 2018.  In that position, she was compensated on a contingent, commission-only basis and typically worked 40 or more hours per week (and more than 8 hours per day).

27.     Defendant required Plaintiffs to sign a "Independent Agent Agreement" at the onset of their employment (hereinafter referred to as the "Agreement").  *Exhibit 3*.

28.     Defendant's Agents were responsible for, among other things:  (a) booting up their computers and logging into several software programs before taking/making phone calls; (b) remaining on the phones for their entire shift; (c) making outbound calls when no calls are incoming; (d) ensuring that every inbound call is accounted for in Defendant's computer systems; (e) if needed, asking sales managers for additional sales leads to call; and (f) logging out of the computer programs and shutting down their computers.

29.     Defendant required its Agents to work rigid schedules, usually consisting of ten (10) hours per day and five to six (5-6) days per week and resulted in overtime hours

on a weekly basis.

30.    Defendant had strict expectations that its Agents would remain on the phone while the lead generator was open to them in order to ensure all the leads were contacted. Defendant threatened discipline if an Agent failed to do so or if an Agent did not sell enough insurance products.

31.    Defendant did not require their Agents to clock in/out for their shifts and did not otherwise track the Agents' work time through any manual or computerized timekeeping system. Failing to accurately account for and pay for all of the time actually worked by employees is a clear violation of FLSA's record keeping requirements. *See* 29 U.S.C. § 211(c).

## Defendant's Compensation System

32.    Defendant's Agents were paid on a contingent, commission only basis. Under this compensation system, Agents were paid a fixed amount, depending on what type of product was sold. For example: Agents received $20 per Basic Dental member; $35 per each Premium Dental member; $10 per each Vision member; and $40 per each ACA member enrolled. *Exhibit 3*, Schedule A, ¶¶ C, D, E, and M.

33.    Plaintiffs and Defendant's similarly situated Agents were not paid an hourly rate.

34.    Under the terms of the Agreement, Agents were generally paid on the 1st and 15th of each month. *Exhibit 3*, p. 10.

35.    The Defendant retained "the right to offset overpayments to Agent against amounts due to Agent." *Exhibit 3*, ¶ 6.4.

36.    Defendant imposed a written "chargeback policy," which provided that if any consumer cancelled an insurance plan sold within the first several months, it would result in a chargeback of commissions previously credited to the Agent responsible for the sale, as follows:

| A. | Any Medicare/Final Expense Sales that cancel within the first months after going active will be fully charged back |
|----|---|
| B. | Medicare/Final Expense Sales that cancel from months 2 to 6 will be charged back at 50% |
| C. | Medicare/Final Expense Sales that cancel from months 6-12 will be charged back at 25% |
| D. | Any ACA sales that are cancelled within the first 2 months of active date full chargeback |

37.    Thus, in the event an Agent's sales were cancelled within the first twelve (12) months, the chargeback was taken from the Agents' check(s).

38.    Defendant provided each Agent with a telephone number and a direct extension.

39.    All Agents used a phone system called "360 Dollar," which was provided to them by Defendant.

40.    Because Defendant failed to record their Agents' work time, Defendant's compensation system failed to properly account for and compensate Agents for all time worked, including their overtime hours and minimum wages owed, during each day and during each workweek.

41.    As a result of Defendant's compensation policy, Plaintiffs and all other Agents were deprived of pay for compensable time worked, including overtime and minimum wages.

**Overtime Violations**

42.    Throughout their employment with Defendant Plaintiffs and other Agents were required to work a substantial amount of overtime.

43.    Defendant's Agents were completely dependent on receiving leads from Defendant via Defendant's lead generator ("True Coverage Marketplace Portal"). Defendant informed its Agents what time the cue would be turned on, so that Agents could be logged in during those hours to receive leads.  Generally, Defendant turned the cue on from 8:00 AM to 9:00 PM, Monday through Friday.  Hours on the weekend

COLLECTIVE & CLASS COMPLAINT AND JURY DEMAND

varied.

44.    Defendant's Agents, including Plaintiffs, generally worked between nine (9) and ten (10) hour days from Monday through Friday, and also one full day over the weekend.

45.    At all relevant times, Defendant's Agents, including Plaintiffs, worked well in excess of eight (8) hours per day and forty (40) hours per week.

46.    Defendant failed to pay its Agents any overtime premiums whatsoever, as required by the FLSA and the California Labor Code.

**Minimum Wage Violations**

47.    Agents were completely dependent on the sums paid to them by Defendant under Schedule A of the Agreement and Agents did not receive an hourly base rate.

48.    Agents often worked well in excess of forty (40) hours in a workweek, but were not paid at the state and federal minimum wage rate for all hours worked.

49.    For example, Plaintiff Costa's 1099 reflects that she was paid a total of $2,870 by Defendant from October 18, 2017 to December 31, 2017.  Plaintiff Dudley alleges she worked well in excess of 40 hours in every workweek during this period, but assuming she only worked 40 hours in those workweeks, at the federal minimum wage of $7.25 per hour, she should have been paid a minimum of $290 per week or $3,045 over the 10.5 week period.  ***Exhibit 4***, Costa 2017 Form 1099.

50.    As another example, during the pay period of 12/16/2017 to 12/31/2017 Plaintiff Dudley was paid just $225 by Defendant, despite working well in excess of 40 hours in each workweek during the pay period.  Even if Plaintiff only worked 40 hours in each workweek, Defendant was required to pay her at least $290 per week ($7.25 x 40 hours), but failed to do so.  ***Exhibit 5***, Dudley Earnings Statement.

**Meal Period Violations**

51.    Defendant failed to provide Agents with a lunch period during each shift. Instead, Defendant required Agents to work through meal periods if there were not enough Agents to cover the phones.

COLLECTIVE & CLASS COMPLAINT AND JURY DEMAND

52.     Under the federal law, in order to deduct an unpaid meal period from an employees' compensable time, an employee must be completely relieved of his or her employment duties for the entire lunch break. 29 CFR 785.19(a) states:

> Bona fide meal periods. Bona fide meal periods are not work time. Bona fide meal periods do not include coffee breaks or time for snacks. These are rest periods. The employee must be _completely relieved_ from duty for the purposes of eating regular meals. Ordinarily 30 minutes or more is long enough for a bona fide meal period. A shorter period may be long enough under special conditions. The employee is not relieved if he is required to perform any duties, whether active or inactive, while eating. For example, an office employee who is required to eat at his desk or a factory worker who is required to be at his machine is working while eating. (emphasis added).

53.     However, Defendant did not provide their Agents with a legitimate bona fide meal period.

54.     Under California law, employers must provide a meal period of at least 30 minutes for every five (5) hours worked.  Cal. Lab. Code § 512(a) states:

> An employer may not employ an employee for a work period of more than five hours per day without providing the employee with a meal period of not less than 30 minutes, except that if the total work period per day of the employee is no more than six hours, the meal period may be waived by mutual consent of both the employer and employee. An employer may not employ an employee for a work period of more than 10 hours per day without providing the employee with a second meal period of not less than 30 minutes, except that if the total hours worked is no more than 12 hours, the second meal period may be waived by mutual consent of the employer and the employee only if the first meal period was not waived.

55.     However, Defendant did not provide their Agents with a 30-minute meal period for every five (5) hours worked.

**Rest Period Violations**

56.     On   information   and   belief,   during   the   statutory   liability   period   and

COLLECTIVE & CLASS COMPLAINT AND JURY DEMAND

continuing to the present, Defendant has had a consistent policy of failing to permit and authorize their Agents within the State of California, including Plaintiffs, paid rest periods of at least (10) minutes per four (4) hours worked or major fraction thereof and failing to pay such employees one (1) hour of pay at the employees regular rate of compensation for each workday that the paid rest period is not permitted and authorized, as required by California state wage and hour laws.

57.     Under California law, employers must permit and authorize a paid rest period for every four hours of work or major fraction thereof.  Cal. Lab. Code § 226.7, IWC Wage Orders.

58.     However, Defendant did not provide their Agents with a paid 10 minute rest period for every four hours or major fraction thereof worked.

**Defendant Unlawfully Benefitted From Their Agents' Uncompensated Work**

59.     At all relevant times, Defendant directly benefited from the misclassification of its Agents as independent contractors.

60.     At all relevant times, Defendant controlled the work schedules, duties, protocols, applications, assignments and employment conditions of their Agents.

61.     At all relevant times, Defendant was able to track the amount of time its Agents spent working; however, Defendant failed to document, track, or pay its Agents for all overtime hours worked and at the minimum wage rate, as required by state and federal labor laws.

62.     At all relevant times, Plaintiffs were non-exempt employees, subject to the requirements of the FLSA and the California Labor Code.

63.     Because Defendant's Agents typically worked 40 hours or more in a workweek, and more than eight (8) hours per day, Defendant's policies and practices deprived them of overtime pay.

64.     Defendant knew or should have known that Plaintiffs and other Agents were actually non-exempt employees, entitled to overtime premiums, under the FLSA and California Labor Code.

COLLECTIVE & CLASS COMPLAINT AND JURY DEMAND

65.     Defendant knew or should have known that Plaintiffs and the other Agents were employees, and entitled to meal and rest breaks, as required by the California Labor Code.

66.     As a non-exempt employees, Defendant's Agents were entitled to full compensation for all overtime hours worked at a rate of 1.5 times their "regular rate" of pay.

67.     Under FLSA, the regular rate is the "keystone" to calculating the overtime rate. *Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419 (1945).  It is "the hourly rate actually paid the employee for the normal, nonovertime workweek for which he is employed." 29 C.F.R. §778.108.

68.     No matter how an employee is paid—whether by the hour, by the piece, on a commission, or on a salary—the employee's compensation must be converted to an equivalent hourly rate from which the overtime rate can be calculated.   29 C.F.R. §778.109. "The regular hourly rate of pay is determined by dividing the employee's total remuneration for employment (except statutory exclusions) in any workweek by the total number of hours actually worked by the employee in that workweek for which such compensation was paid." *Id*.

69.     Defendant's contingent, commission-only compensation did not fall within any of the statutory exclusions from the regular rate as provided in 29 U.S.C. §§ 207(e)(1)-(8).

70.     A commission-based employee's regular rate of pay is computed by reference to the number of hours the commission payment is intended to compensate. 29 C.F.R. §778.117.

> This is true regardless of whether the commission is the sole source of the employee's compensation or is paid in addition to a guaranteed salary or hourly rate, or on some other basis, and regardless of the method, frequency, or regularity of computing, allocating and paying the commission. It does not matter whether the commission earnings are computed daily, weekly, biweekly, semimonthly, monthly, or at

COLLECTIVE & CLASS COMPLAINT AND JURY DEMAND

some other interval. The fact that the commission is paid on a basis other than weekly, and that payment is delayed for a time past the employee's normal pay day or pay period, does not excuse the employer from including this payment in the employee's regular rate. *Id*.

71.     There is a statutory presumption that remuneration in any form must be included in the regular rate calculation. The burden is on Defendant to establish that any payment should be excluded. Thus, determining the regular rate starts from the premise that all payments made to Plaintiffs for work performed are included in the base calculation unless specifically excluded by statute.

72.     Even "[w]hen the commission is paid on a weekly basis, it is added to the employee's other earnings for that workweek (except overtime premiums and other payments excluded as provided in section 7(e) of the Act), and the total is divided by the total number of hours worked in the workweek to obtain the employee's regular hourly rate for the particular workweek. The employee must then be paid extra compensation at one-half of that rate for each hour worked in excess of the applicable maximum hours standard." 29 C.F.R. §778.118.

73.     Once the total amount of an employee's "regular" compensation is deduced, "the determination of the regular rate becomes a matter of mathematical computation." *Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419, 425 (1945). The regular rate must be expressed as an hourly rate because, although any method of compensating an employee is permitted, the FLSA imposes its overtime requirements in terms of hourly wages. Thus, if necessary, an employer must convert an employee's wages to rate per hour to determine compliance with the statute.

74.     Because Defendant's compensation scheme failed to incorporate the regular rate of pay, Defendant failed to properly compensate Plaintiffs and its other Agents under the FLSA and the California Labor Code.

75.     Under California law, employees are entitled to "no less than one and one-half times the regular rate of pay" for work in excess of eight hours in one workday. Any

work in excess of 12 hours in one day shall be compensated at the rate of no less than twice the regular rate of pay for an employee. In addition, any work in excess of eight hours on any seventh day of a workweek shall be compensated at the rate of no less than twice the regular rate of pay of an employee. Cal. Lab. Code, § 510(a).

76.    The California Division of Labor Standards Enforcement Manual section 49.2.4.2 provides a reasonable formula for calculating overtime on a flat sum bonus. The flat sum bonus formula set forth in sections 49.2.4.2 and 49.2.4.3 of the Manual, which uses a divisor of straight time, instead of total hours worked to set the regular bonus rate, and a multiplier of 1.5, rather than 0.5, to fix the bonus overtime due, produces "a premium based on bonus" that is necessary to avoid encouraging the use of overtime.

77.    Because Defendant's compensation scheme failed to incorporate the California Division of Labor Standards Enforcement Manual formula, Defendant failed to properly compensate Plaintiffs and its other Agents under the California Labor Code.

78.    Because Defendant's weekly pay period compensation scheme did not pay commissions in the week in which they were earned, Defendant failed to properly compensate Plaintiffs and its other Agents under the California Labor Code. *See e.g.*, *Peabody v. Time Warner Cable, Inc.*, 59 Cal. 4th 662, 663 (Cal. 2014) (An employer may not attribute commission wages paid in one pay period to other pay periods in order to satisfy the minimum earnings prong of the commissioned employee exemption to the overtime requirement in Lab. Code, § 510).

79.    The California Legislature has commanded that "all wages... ...earned by any person in any employment are due and payable twice during each calendar month, on days designated in advance by the employer as the regular paydays", and further that "[a]ny work in excess of eight hours in one workday and any work in excess of 40 hours in any one workweek . . . shall be compensated at the rate of no less than one and one-half times the regular rate of pay for an employee." (Lab. Code § 204 and § 510(a).) The Industrial Welfare Commission (IWC), however, is statutorily authorized to "establish exemptions from the requirement that an overtime rate of compensation be

paid... ...for executive, administrative, and professional employees, provided [inter alia] that the employee is primarily engaged in duties that meet the test of the exemption, [and] customarily and regularly exercises discretion and independent judgment in performing those duties..." (Lab. Code § 510(a)). None of the Agents qualify for exemption from the above requirements.

80.    Similarly, Defendant's Agents are not exempt from overtime under the so-called California "commissioned employee" exemption because, as set forth herein, their earnings did not "exceed one and one-half times the minimum wage." Cal. Code Regs. tit. 8, § 11040.

81.    The retail or service establishment exemption to the FLSA's overtime provisions does not apply for the same reason – Defendant failed to pay its Agents a "regular rate of pay … in excess of one and one-half times the minimum hourly rate." 29 U.S.C. § 207(i).

82.    Pursuant to Cal. Lab. Code § 204, other applicable laws and regulations, and public policy, an employer must timely pay its employees for all hours worked.

83.    Defendant maintained a uniform wage practice of paying the Agents without regard to the true number of all hours worked, including overtime hours they worked. As set forth herein, Defendant's uniform policy and practice was to unlawfully and intentionally deny timely payment of wages due for all hours worked at the minimum wage required, including the overtime hours worked by the Plaintiffs and Agents.

## **MISCLASSIFICATION ALLEGATIONS**

84.    Under the FLSA, "employer" is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee. 29 U.S.C. § 203(d).

85.    The definition of "employer" under the FLSA is not limited by the common law concept of "employer," and is to be given an expansive interpretation in order to effectuate the FLSA's broad remedial purposes. *Real v. Driscoll Strawberry Assocs.,* 603 F.2d 748, 754 (9th Cir. 1979).

86.    Congress defined "employee" as "any individual employed by an

14

employer," 29 U.S.C. § 203(e)(1), describing this language as "the broadest definition that has ever been included in any one act." *United States v. Rosenwasser*, 323 U.S. 360, 363 n.3, 65 S.Ct. 295, 89 L.Ed. 301 (1945) (quoting 81 Cong. Rec. 7657 (1937) (statement of Sen. Hugo Black)); *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 300 n.21, 105 S.Ct. 1953, 85 L.Ed.2d 278 (1985) (same).

87.    The determination of whether an employer-employee relationship exists does not depend on "isolated factors but rather upon the circumstances of the whole activity." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730, 67 S.Ct. 1473, 1477, 91 L.Ed. 1772 (1947). The touchstone is "economic reality." *Goldberg v. Whitaker House Cooperative, Inc.,* 366 U.S. 28, 33, 81 S.Ct. 933, 936, 6 L.Ed.2d 100 (1961).

88.    The ultimate question of whether a party is an "employer" is a legal issue. *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1469–70 (9th Cir. 1983).  The ultimate determination must be based "upon the circumstances of the whole activity." *Id.* at 1470 (citing *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 67 S.Ct. 1473, 1477, 91 L.Ed. 1772 (1947).

**Federal Independent Contractor Analysis**

89.    The determining factor as to whether Plaintiff and those similarly situated are employees or independent contractors under FLSA is not the workers' election, subjective intent, or any contract.  Rather, the test for determining whether an individual is an "employee" under the FLSA is the economic reality test.  *See Rutherford Food Corp. v. McComb*, 331 U.S. 722, 727 (1947).  Under the economic reality test, employee status turns on whether the individual is, as a matter of economic reality, in business for herself and truly independent or, rather, is economically dependent upon finding employment in others.

90.    Under the applicable test, courts utilize the following factors to determine economic dependence and employment status: (1) the degree of control exercised by the alleged employer; (2) the relative investments of the alleged employer and employee; (3) the degree to which the employee's opportunity for profit and loss is determined by the

employer; (4) the skill and initiative required in performing the job; (5) the permanency of the relationship; and (6) the degree to which the alleged employee's tasks are integral to the employer's business.

91.     The totality of circumstances surrounding the employment relationship between Defendant and its Agents establishes economic dependence by the Agents on Defendant and employee status.  Here, Plaintiffs and all other Agents are not in business for themselves and truly independent, but rather are economically dependent upon finding employment with Defendant.  The Class members are not engaged in occupations or businesses distinct from that of Defendant. To the contrary, the Class members are the basis for Defendant's business.  (Emphasis added.)  Defendant obtains the customers who seek out insurance products ("leads"), and Defendant provides the Agents with their leads by passing them on via a computer application ("cue") that is utilized by all Agents.

**A. Control Exercised by Defendant**

92.     Defendant retains pervasive control over the business operations as a whole, and all Agents work activities.

93.     Defendant required Agents to read their sales pitch from a script.  This document is identified by Defendant as "True Coverage ACA Script 2018."  The script tells them what to say, what questions to ask, and even when to pause while reading the script.  Additionally, the script instructs Agents how to respond to objections from the customer.

94.     Defendant entered into written agreements (the "Agreement") with the Agents regarding, *inter alia*, their compensation, company policies and procedures, job duties, and job expectations. (*See e.g., **Exhibit 3**).

95.     The Agreement states that "Agent will comply with the Company's rules and regulations relating to the preparation of proposals and the completion and submission of applications." ***Exhibit 3***, ¶ 2.4.

96.     "Agent may not waive any provision in the Company's underwriting

COLLECTIVE & CLASS COMPLAINT AND JURY DEMAND

standards or the insurers' standards." *Exhibit 3*, ¶ 2.3

97.    Furthermore, the agreement states that "Agent shall have no authority and will not make any oral or written alteration, modification, or waiver of any of the terms or conditions of any Policy whatsoever." *Exhibit 3*, ¶ 2.4.

98.    The Agreement states Defendant "shall make available for Agent's use, standard advertising prepared for the Company." *Exhibit 3*, ¶ 2.7.

99.    For purposes of selling Defendant's insurance products, the agreement states that "[f]or all products, the Company will provide approved brochures and other approved marketing materials for sales campaigns." *Exhibit 3*, ¶ 3.1.

100.    In the ultimate exercise of control, Defendant "reserves the right to reject any and all applications for its Policies submitted by Agent." *Exhibit 3*, ¶ 4.1.

101.    "All information related to Policies underwritten by Insurers and persons covered by those Policies, including, but not limited to, lists of insured's names, addresses, other relevant information, application(s), master policies, files, documents and correspondence are the property of the Company subject at all times to its control." *Exhibit 3*, ¶ 5.4.

102.    Defendant provided all the necessary tools, equipment and materials (such as computer applications, leads, marketing materials, and training materials) used by the Agents.

103.    Agents were provided with training by Defendant and sold insurance under Defendant's insurance license.

104.    Defendant requires all Agents to use the "True Coverage Marketplace" to obtain sales leads.  At all relevant times, Defendant controls when Agents have access to the True Coverage Marketplace.  Defendant also controls the geographic region of leads that Agents have access to within the True Coverage Marketplace.

105.    While working, Defendant requires Agents to have the application Skype open on their computers.  This program is used by Defendant to conduct meetings with Agents and to answer any questions or problems Agents encounter during their shift.

COLLECTIVE & CLASS COMPLAINT AND JURY DEMAND

**B. The Relative Investments of the Employer and Employee**

106.   As set forth above, Defendant retains control and ownership of the Agents' perspective.   Defendant invests in marketing to these leads by way of their website and other advertising mediums.

107.   In addition to the leads, Defendant is the sole investor in obtaining the insurance products to be sold by agents to the leads.   The Agreement specifically refers to the products as the "Company's products."  ***Exhibit 3***, ¶ 2.7.

108.   Defendant obtains and invests in the "approved brochures and other approved marketing materials for sales campaigns."  ***Exhibit 3***, ¶ 3.1.

**C. Degree Employer Influences Profit or Loss**

109.   The ability for Agents to earn a profit is substantially in the hands of Defendant, as Agents depend on Defendant for their leads, which are provided via the True Coverage Market Place.

110.   Plaintiffs and the other Agents' opportunity to make a profit was dictated by Defendant because Defendant reserved the right to "reject any and all applications for its Policies submitted by Agent." ***Exhibit 3***, ¶ 4.1.

111.   Defendant owns and controls the leads Plaintiffs are dependent on to earn a profit.   Additionally, Defendant has the ability to restrict or revoke Agents access to those leads at any time.

112.   Any residuals on insurance policies that are sold by Defendant's Agents go to Defendant, not the Agent, because the policies are sold under Defendant's insurance license, not the Agent's insurance license.

113.   Defendant provides all of its Agents with errors and omissions insurance.

114.   Plaintiffs and the other Agents have no opportunity to incur loss in any real sense.

**D. Skill and Initiative Required for the Job**

115.   Defendant mandates that Agents may not make any "representations whatsoever with respect to the nature or scope of the benefits of the Policies sold except

through and by means of the written material either prepared and furnished to Agent for that purpose by Company or approved in writing by the Company prior to its use." This promise is a "material part of the consideration for the making of th[e] Agreement." In other words, Defendant dictates how Agents sell the products. ***Exhibit 3***, ¶ 2.4.

116. Plaintiffs and Defendant's other Agents are not permitted to set or negotiate the prices of Defendant's insurance products.

117. As stated herein, Defendant determines what products are to be sold, who the products are sold to, and when the products are to be sold.

118. Defendant requires Agents to "comply with the Company's rules and regulations" and provides them with training to perform their jobs. This includes training on the programs Agents use to complete their jobs, such as: Ring Central, Skype, Zoiper, Go Daddy, Outlook, and the True Coverage Marketplace.

**E. The Permanency of the Relationship**

119. The term of the Agreement between the parties is essentially perpetual. It states that the agreement "will begin on the effective date and terminate twelve (12) months thereafter, at which time it will automatically renew for subsequent one (1) year periods unless either party gives written notice a[t] least sixty (60) days prior to termination date or unless termination is otherwise provided herein." ***Exhibit 3***, ¶ 7.2.

**F. Agents' Duties Were Integral to Defendant's Business**

120. According to Defendant's website, Defendant "brings together health care options from leading health plans in a simple-to-use and easy-to-understand shopping site." *See* https://truecoverage.com/aboutus/ (last visited 4/2/18).

121. Defendant solicits leads by holding Agents out as employees and encouraging consumers to "talk to one of *our* expert license agents on choosing the right health insurance plans for your family or business." *See* https://truecoverage.com/ (last visited on 3/21/18).

122. Defendant's Agents facilitate the sale of the insurance products offered on Defendant's website. The duties of the Agents are integral to Defendant's business.

COLLECTIVE & CLASS COMPLAINT AND JURY DEMAND

### California Independent Contractor Analysis

123.  "[U]nder California law, once a plaintiff comes forward with evidence that he provided services for an employer, the employee has established a prima facie case that the relationship was one of employer/employee."  *Narayan v. EGL, Inc.*, 616 F.3d 895, 900 (9th Cir. 2010).

124.  "Although it's easy to get lost in the weeds when applying California's test for deciding whether a worker is an employee or an independent contractor, courts should apply the test with an eye towards the purposes those statutes were meant to serve, and the type of person they were meant to protect." *Cotter v. Lyft, Inc.*, 60 F. Supp. 3d 1067, 1075 (N.D. Cal. 2015).

125.  The "right to control work details is the *most important or most significant* consideration." *Ruiz v Affinity Logistics, Corp.*, 754 F.3d 1093, 1100 (9th Cir. 2014) (*citing S.G. Borello & Sons, Inc. v . Dep't of Indus. Relations*, 48 Cal. 3d 341, 350 (1989).

126.  Additional factors used by Courts in California include: "(a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee." *Borello*, at 351.

127.  "[T]he individual factors cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations." *Borello*, 48 Cal. 3d 341, 351 (1989).

COLLECTIVE & CLASS COMPLAINT AND JURY DEMAND

128.  California has a "materially greater interest than [New Mexico] in the outcome of this case." *Ruiz v. Affinity Logistics Corp.*, 667 F.3d 1318, 1324 (9th Cir. 2012).  Therefore, despite the Agreement containing a New Mexico choice of law clause, the California independent contractor legal analysis must be applied to Plaintiffs' state law claims.  *Id.*

## **FLSA COLLECTIVE ACTION ALLEGATIONS**

129.  Plaintiffs bring this action pursuant to 29 U.S.C. § 216(b) of the FLSA on their own behalf and on behalf of:

> **All current and former Agents who worked for any Defendant at any time from May 1, 2015 through judgment.**

(hereinafter referred to as the "FLSA Collective").  Plaintiffs reserve the right to amend this definition if necessary.

130.  Defendant is liable under the FLSA for, *inter alia*, failing to properly compensate Plaintiffs and other similarly situated Agents.

131.  Excluded from the proposed FLSA Collective are Defendant's executives, administrative and professional employees, including computer professionals and outside sales persons.

132.  Consistent with Defendant's policy and pattern or practice, Plaintiffs and the members of the FLSA Collective were not paid premium overtime compensation when they worked beyond 40 hours in a workweek.

133.  Plaintiffs and the members of the FLSA Collective were not paid the FLSA mandated minimum wage of $7.25 per hour for all hours worked.

134.  All of the work that Plaintiffs and the FLSA Collective members performed was assigned by Defendant, and/or Defendant was aware of all of the work that Plaintiffs and the FLSA Collective members performed.

135.  As part of its regular business practice, Defendant intentionally, willfully, and repeatedly engaged in a pattern, practice, and/or policy of violating the FLSA with

respect to Plaintiffs and the FLSA Collective members.    This policy and pattern or practice includes, but is not limited to:

    a.  Misclassifying Plaintiffs and the FLSA Collective as independent contractors;

    b.  Willfully failing to pay its employees, including Plaintiffs and the FLSA Collective, the federally mandated minimum wage for all hours worked;

    c.  Willfully failing to pay its employees, including Plaintiffs and the FLSA Collective, premium overtime wages for all hours worked in excess of 40 hours per workweek; and

    d.  Willfully failing to record all of the time that its employees, including Plaintiffs and the FLSA Collective, worked for Defendant's benefit.

136.  Defendant is aware or should have been aware that federal law required them to pay Plaintiffs and the FLSA Collective overtime premiums for all hours worked in excess of 40 per workweek and a minimum wage of at least $7.25 per hour for all hours worked.

137.  Defendant failed to properly maintain timekeeping and payroll records pertaining to the FLSA Collective under the FLSA, 29 U.S.C. 211(c).

138.  Defendant's unlawful conduct was widespread, repeated, and consistent.

139.  A collective action under the FLSA is appropriate because the employees described above are "similarly situated" to Plaintiffs under 29 U.S.C. § 216(b). The employees on behalf of whom Plaintiffs bring this collective action are similarly situated because (a) they have been or are employed in the same or similar positions; (b) they were or are performing the same or similar job duties; (c) they were or are subject to the same or similar unlawful practices, policy, or plan; and (d) their claims are based upon the same factual and legal theories.

140.  The employment relationships between Defendant and every proposed FLSA Collective member are the same and differ only by name, location, and rate of pay. The key issue – whether Defendant's classification and compensation practices and

policies violate the FLSA – do not vary substantially among the proposed FLSA Collective members.

141.   There are many similarly situated current and former Agents who were underpaid in violation of the FLSA who would benefit from the issuance of a court-supervised notice of this lawsuit and the opportunity to join it.

142.   This notice should be sent to the FLSA Collective pursuant to 29 U.S.C. § 216(b).

143.   Those similarly situated employees are known to Defendant, are readily identifiable, and can be located through Defendant's records.

144.   Plaintiffs estimates the proposed FLSA Collective, including both current and former employees over the relevant period will include several hundreds, if not thousands, of workers. The precise number of FLSA Collective members should be readily available from a review of Defendant's personnel and payroll records.

## RULE 23 CALIFORNIA CLASS ALLEGATIONS

145.   Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(3) on their own behalf and on behalf of all similarly situated current and former employees of Defendant who are or were employed at any time in the last four years.  Plaintiffs propose the following class definition:

> ***All current and former Agents who were employed by Defendant in California at any time from May 1, 2014 through judgment.*** (collectively referred to as  the "California Class")

146.   Plaintiffs also seek to represent the subclasses composed of and defined as follows:

> ***All former Agents who were employed by Defendant in California at any time from May 1, 2015 through judgment that have since  separated their employment.*** (collectively referred to as the "Waiting Time Subclass")

> ***All current and former Agents who were employed by Defendant in California at any time from May 1, 2017 through judgment.*** (collectively

COLLECTIVE & CLASS COMPLAINT AND JURY DEMAND

referred to as the "Wage Statement Subclass")

147.   Plaintiffs reserve the right to amend the putative class and subclass definitions if necessary.

148.   Plaintiffs share the same interests as the putative class and will be entitled under the California Labor Code to unpaid overtime compensation, attorneys' fees, and costs and lost interest owed to them under nearly identical factual and legal standards as the remainder of the putative class.

149.   The putative Class meets the numerosity requirement of Rule 23(a)(1) because, during the relevant period, Defendant employed hundreds, if not thousands, of Agents throughout the country.  The Class members are so numerous that joinder of all such persons is impracticable and that the disposition of their claims in a class action rather than in individual actions will benefit the parties and the Court. The precise number of Class members should be readily available from a review of Defendant's personnel, scheduling, time, phone, and payroll records (if Defendant maintained such records in compliance with the law), and from input received from the putative Class members.

150.   The putative Class meets the commonality requirement of Rule 23(a)(2) because, during the relevant period, Defendant engaged in a common course of conduct that violated the legal rights of Plaintiffs and the Class.   Individual questions that Plaintiffs' claims present, to the extent any exist, will be far less central to this litigation than the numerous material questions of law and fact common to the Class, including but not limited to:

a. Whether Defendant misclassified Plaintiffs as independent contractors;
b. Whether Defendant engaged in a policy or practice of failing to pay each Class member regular wages for each non-overtime hour worked;
c. Whether Defendant engaged in a policy or practice of failing to pay each Class member overtime compensation for each overtime hour worked; and
d. Whether Defendant engaged in a policy or practice of failing to

pay each Class member the applicable minimum wage rate for all hours worked;

e. Whether Defendant violated Labor Code sections 221 and 223 by making unlawful deductions to Class members' wages;

f. Whether Defendant violated Labor Code sections 226.2 and 226.7 by failing to permit and authorize paid rest periods;

g. Whether Defendant violated Labor Code section 204 by failing to pay earned wages within seven days of the end of the pay period;

h. Whether Defendant failed to provide each California Class member with at least one 30-minute meal period on every workday of at least 5 hours and a second 30-minute meal period on every workday of at least 10 hours as required by the California Employment Law and Regulations;

i. Whether Defendant violated sections 201 to 203 of the Labor Code by willfully failing to pay all wages and compensation due each California Class member who quit or who was discharged;

j. Whether Defendant violated section 226 of the Labor Code by willfully failing to provide accurate itemized wage statements showing the number of hours worked by each California Class member and the corresponding hourly rate;

k. Whether Defendant violated sections 1174 and 1175 of the Labor Code and the applicable Industrial Welfare Commission Orders by failing to maintain records pertaining to when California Class members began and ended each work period, the total daily hours worked, and the total hours worked per pay period;

l. Whether Defendant violated section 510 of the Labor Code and the applicable Industrial Welfare Commission Orders by failing to accurately calculate regular rates of pay for overtime purposes;

m. Whether Defendant violated section 2802of the Labor Code by willfully failing to reimburse each California Class member any reasonable business expenses incurred;

n. Whether Defendant was unjustly enriched by the work and services performed by Class members without compensation;

o. Whether Defendant engaged in unfair business practices in violation of Business and Professions Code section 17200, *et seq.*; and

p. Whether Defendant should be required to pay compensatory damages, attorneys' fees, penalties, costs, and interest for violating California state law.

151. The status of all individuals similarly situated to Plaintiffs raises an identical

legal question: whether Defendant's Agents are entitled to back wages, including overtime.

152.   The putative California Class meets the typicality requirement of Rule 23(a)(3) because Plaintiffs and the putative California Class members were all employed by Defendant and performed their job duties without receiving wages, including overtime wages and minimum wages, owed for that work.

153.   The California Class meets the adequacy requirement of Rule 23(a)(4) because there is no apparent conflict of interest between Plaintiffs and the putative Class members, and because Plaintiffs' attorneys have successfully prosecuted many complex class actions, including wage and hour class and collective actions, and will adequately represent the interests of Plaintiffs and the putative Class members.

154.   The putative California Class meets the predominance requirement of Rule 23(b)(3), because issues common to the California Class predominate over any questions affecting only individual members, including but not limited to, those listed above.

155.   The California Class meets the superiority requirement of Rule 23(b)(3) because allowing the parties to resolve this controversy through a class action would permit a large number of similarly situated persons to prosecute common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.

156.   Given the material similarity of the California Class members' claims, even if each California Class member could afford to litigate a separate claim, this Court should not countenance or require the filing of hundreds or even thousands of identical actions.   Individual litigation of the legal and factual issues raised by Defendant's conduct would cause unavoidable delay, a significant duplication of efforts, and an extreme waste of resources.   Alternatively, proceeding by way of a class action would permit the efficient supervision of the putative California Class's claims, create significant economies of scale for the Court and the parties and result in a binding, uniform adjudication on all issues.

COLLECTIVE & CLASS COMPLAINT AND JURY DEMAND

## COUNT I

## VIOLATION OF FLSA, 29 U.S.C. § 201, *et seq*.

## FAILURE TO PAY OVERTIME WAGES

157.   Plaintiffs re-allege and incorporate all previous paragraphs herein.

158.   At all times relevant to this action, Defendant was engaged in interstate commerce, or in the production of goods for commerce, as defined by the FLSA.

159.   At all times relevant to this action, Plaintiffs were "employees" of Defendant within the meaning of 29 U.S.C. § 203(e)(1) of the FLSA.

160.   Plaintiffs and the FLSA Collective members, by virtue of their job duties and activities actually performed, are all non-exempt employees.

161.   Defendant does not qualify as a "retail or service establishment" as defined by 29 U.S.C. § 207 (i) of the FLSA.

162.   Plaintiffs regular rate of pay was not in excess of one and one-half times the minimum hourly rate required by 29 U.S.C. § 206 of the FLSA

163.   Plaintiffs either: (1) engaged in commerce; or (2) engaged in the production of goods for commerce; or (3) were employed in an enterprise engaged in commerce or in the production of goods for commerce.

164.   At all times relevant to this action, Defendant "suffered or permitted" Plaintiffs and all similarly situated current and former employees to work and thus "employed" them within the meaning of 29 U.S.C. § 203(g) of the FLSA.

165.   At all times relevant to this action, Defendant failed to pay Plaintiffs and the FLSA Collective federally mandated overtime compensation for work performed in excess of forty (40) hours in a workweek.

166.   In workweeks where Plaintiffs and other FLSA Collective members worked 40 hours or more, all overtime should have been paid at the federally mandated rate of 1.5 times each employee's regularly hourly wage.  29 U.S.C. § 207.

167.   Defendant's violations of the FLSA were knowing and willful. Defendant knew or could have tracked the hours worked by Agents, properly classified Agents as

employees, and paid them overtime wages as required by the FLSA, but it did not.

168.  The FLSA, 29 U.S.C. § 216(b), provides that as a remedy for a violation of the Act, each employee is entitled to his or her unpaid wages (including unpaid overtime), plus an additional equal amount in liquidated damages (double damages), plus costs and reasonable attorneys' fees.

## COUNT II
## VIOLATION OF FLSA, 29 U.S.C. § 201, *et seq*.
## FAILURE TO PAY MINIMUMWAGES

169.  Plaintiffs re-allege and incorporate all previous paragraphs herein.

170.  At all relevant times herein, Plaintiffs and the FLSA Collective were entitled to the rights, protections, and benefits provided under the FLSA, 29 U.S.C. §§ 201, et seq.

171.  The FLSA regulates, among other things, the payment of minimum wage by employers whose employees are engaged in interstate commerce, or engaged in the production of goods for commerce, or employed in an enterprise engaged in commerce or in the production of goods for commerce.  29 U.S.C. § 206(a).

172.  Defendant is subject to the FLSA's minimum wage requirements because they are an enterprise engaged in interstate commerce, and their employees are engaged in commerce.

173.  Under Section 6 of the FLSA, codified at 29 U.S.C. § 206, employees must be compensated at a rate of at least $7.25 per hour.  This has been the case since July 24, 2009.

174.  Section 13 of the FLSA, codified at 29 U.S.C. § 213, exempts certain categories of employees from federal minimum wage obligations. None of the FLSA exemptions apply to Plaintiffs and the other members of the FLSA Collective.

175.  As alleged herein, Plaintiffs and the FLSA Collective were employees of Defendant and entitled to the FLSA minimum wage.

176.  Defendant failed to pay Plaintiffs and the FLSA Collective the federally

COLLECTIVE & CLASS COMPLAINT AND JURY DEMAND

mandated minimum wage rate in workweeks that their commissions did not cover Defendant's minimum wage obligations.  In such weeks, Defendant failed to provide additional compensation to meet the FLSA's minimum wage requirements.

177.  Defendant's violations of the FLSA were knowing and willful. Defendant knew or could have tracked the hours worked by Agents, properly classified Agents as employees, and paid them minimum wages as required by the FLSA, but it did not.

178.  The FLSA, 29 U.S.C. § 216(b), provides that as a remedy for a violation of the Act, each employee is entitled to his or her unpaid wages, plus an additional equal amount in liquidated damages (double damages), plus costs and reasonable attorneys' fees.

## COUNT III

## VIOLATION OF CALIFORNIA LABOR CODE §§ 510, 1194, 1198 AND IWC WAGE ORDER 4 – FAILURE TO PAY OVERTIME

179.  Plaintiffs re-allege and incorporate all previous paragraphs herein.

180.  At all relevant times, Defendant regularly and consistently maintained corporate policies and procedures designed to reduce labor costs by reducing or minimizing the amount of compensation paid to its employees, especially overtime compensation.  For example, misclassifying Agents as independent contractors.

181.  At all relevant times, Plaintiffs and the California Class regularly performed non-exempt work and were thus subject to the overtime requirements of California law.

182.  Labor Code §§ 510 and 1198 and Industrial Welfare Commission ("IWC") Wage Order No. 4 § 3(A) provide that: (a) employees are entitled to compensation at the rate of one and one-half times their regular rate of pay for all hours worked in excess of eight (8) hours in a workday up to twelve (12) hours in a workday, in excess of forty (40) hours in a workweek, and for the first eight (8) hours of work on the seventh (7th) consecutive day or a workweek; and (b) employees are entitled to compensation at the rate of twice their regular rate of pay for all hours worked in excess of twelve (12) hours in a workday, and in excess of eight (8) hours on the seventh (7th) consecutive day of

COLLECTIVE & CLASS COMPLAINT AND JURY DEMAND

work in a workweek.

183. At all relevant times, Plaintiffs and the California Class regularly worked in excess of eight (8) hours in a workday and/or in excess of forty (40) hours in a workweek.

184. At all relevant times, Defendant failed and refused to pay Plaintiffs and the California Class overtime premiums for hours worked in excess of forty (40) hours in a workweek.

185. Plaintiffs and the California Class were not exempt from the California overtime requirements. Plaintiffs and the California Class did not earn one and one half times the California minimum wage for all hours during each pay period.

186. Defendant intentionally, maliciously, fraudulently and with the intent to deprive the California Class of their ability to earn a living, so as to reduce their labor costs, knowingly and willingly implemented a scheme or artifice to avoid paying overtime by reducing the rate of pay to Plaintiffs and other California Class members who worked overtime hours.

187. Plaintiffs and the California Class were entitled to receive overtime compensation based on their lawful regular rate of pay. Defendant's failure to pay lawful premium overtime wages, as alleged above, was a willful violation of Labor Code §§ 510, 1198, and IWC Wage Order No. 4.

188. Wherefore, Plaintiffs demand payment of the unpaid balance of the full amount of wages due for overtime premiums owing, including interest thereon, penalties, reasonable attorneys' fees, and costs of suit pursuant to Labor Code §§ 1194 and 1194.2 as a result of Defendant's failure to pay premium compensation, as is required under California law.

## COUNT IV

## VIOLATION OF CALIFORNIA LABOR CODE §§ 1194, 1197, and 1197.1 AND IWC WAGE ORDER 4 – FAILURE TO PAY MINIMUM WAGES

189. Plaintiffs re-allege and incorporate all previous paragraphs herein.

190. At all relevant times, Defendant regularly and consistently maintained

COLLECTIVE & CLASS COMPLAINT AND JURY DEMAND

corporate policies and procedures designed to reduce labor costs by reducing or minimizing the amount of compensation paid to its employees, including policies and procedures that denied Plaintiffs and the California Class the required minimum wages.

191. Pursuant to California Labor Code § 1194, "any employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage or overtime compensation, including interest thereon, reasonable attorney fees, and costs of suit."

192. Pursuant to California Labor Code § 1197, "[t]he minimum wage for employees fixed by the commission or by any applicable state or local law, is the minimum wage to be paid to employees, and the payment of a lower wage than the minimum so fixed is unlawful."

193. As of January 1, 2017, the California minimum wage was $10.50 per hour. On January 1, 2018 that amount increased to $11.00 per hour.

194. As of July 1, 2017, the minimum wage for Los Angeles County was raised to $12.00 per hour. Named Plaintiffs both reside in Los Angeles County (Burbank and Monrovia).

195. Defendant failed to compensate Plaintiffs and the California Class at the applicable state and local minimum wage rates. This was particularly prevalent when Defendant imposed a "charge back" against the money to be paid to the Agents.

196. Plaintiffs and the California Class were entitled to receive minimum wage compensation based on the applicable state and local minimum wage rates. Defendant's failure to pay lawful minimum wages, as alleged above, was a willful violation of Labor Code §§ 510, 1194, 1197, 1197.1 and IWC Wage Order No. 4

197. Wherefore, Plaintiffs demand payment of the unpaid balance of the full amount of wages due for minimum wages owing, including interest thereon, penalties, reasonable attorneys' fees, and costs of suit pursuant to Labor Code §§ 1194 and 1194.2 as a result of Defendant's failure to pay minimum wage compensation, as is required

COLLECTIVE & CLASS COMPLAINT AND JURY DEMAND

under California law.

**COUNT III**

**VIOLATION OF CALIFORNIA LABOR CODE §§ 221 and 223**

**UNLAWFUL DEDUCTIONS**

198.   Plaintiffs re-allege and incorporate all previous paragraphs herein.

199.  At all relevant times, Defendant regularly and consistently maintained corporate policies and procedures designed to reduce labor costs by reducing or minimizing the amount of compensation paid to its employees.

200.  Defendant made deductions from Plaintiffs' and the California Class members' paychecks, which they referred to as "charge backs."

201.  Labor Code § 221 provides it is unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by employer to employee.

202.   Labor Code § 223 provides that where any statute or contract requires an employer to maintain the designated wage scale, it shall be unlawful to secretly pay a lower wage while purporting to pay the wage designated by statute or by contract. Labor Code section 225 further provides that the violation of any provision of Labor Code §§ 221 and 223 is a misdemeanor.

203.   As a result of the conduct alleged above, Defendant unlawfully collected or received from Plaintiffs and the California Class part of the wages paid to their employees.

204.   Wherefore, Plaintiffs demand the return of all wages unlawfully deducted from the paychecks, including interest thereon, penalties, reasonable attorneys' fees, and costs of suit pursuant to Labor Code §§ 225.5 and 1194.

**COUNT IV**

**VIOLATION OF CALIFORNIA LABOR CODE §§ 226.7 and 512**

**FAILURE TO PROVIDE MEAL BREAKS**

205.   Plaintiffs re-allege and incorporate all previous paragraphs herein.

206.   Labor Code § 512, and IWC Wage Order No. 7 § 11(A) and (B) provide that

an employer may not employ a person for a work period of more than five (5) hours without providing the employee with a meal period of not less than thirty (30) minutes, and may not employ an employee for a work period of more than ten (10) hours per day without providing the employee with a second meal period of not less than (30) minutes.

207.   At all relevant times, Plaintiffs and the California Class consistently worked in excess of five (5) or ten (10) hours in a day.

208.   At all relevant times, Defendant regularly failed to provide meal periods and required employees to perform work during their first and/or second meal periods. Defendant's practice of requiring employees to perform work during their legally mandated meal periods is a violation of Labor Code §§ 226.7 and 512, and IWC Wage Order No. 7.

209.   Defendant purposefully elected not to provide meal periods to Plaintiffs and California Class members, and Defendant acted willfully, oppressively, and in conscious disregard of the rights of Plaintiffs and the California Class members in failing to do so.

210.   Plaintiffs are informed and believe Defendant did not properly maintain records pertaining to when Plaintiffs and the California Class members began and ended each meal period, in violation of Labor Code §1174 and IWC Wage Order No. 7 § 7(A).

211.   As a result of Defendant's knowing, willful, and intentional failure to provide meal breaks, Plaintiffs and the California Class members are entitled to recover one (1) additional hour of pay at the employee's regular rate of pay for each work day that a meal period was not provided, pursuant to Labor Code § 226.7 and 1WC Wage Order No. 7 § 11(D), and penalties, reasonable attorneys' fees, and costs pursuant to Labor Code §§ 1194.

212.   Defendant's wrongful and illegal conduct in failing to provide Class members with meal breaks or to provide premium compensation, unless and until enjoined by order of this Court, will continue to cause great and irreparable injury to Plaintiffs and the Class members in that Defendant will continue to violate these laws unless specifically ordered to comply with the same. The expectation of future violations

will require current and future employees to repeatedly and continuously seek legal redress in order to gain compensation to which they are already entitled. Plaintiffs and the California Class members have no other adequate remedy at law to insure future compliance with the laws alleged herein to have been violated.

213.   Wherefore, Plaintiffs demand pursuant to Labor Code Section 227.7(b) that Defendant pay each Class member one additional hour of pay at the Class member's regular rate of compensation for each work day that the meal period was not provided.

<u>**COUNT V**</u>

<u>**VIOLATION OF CALIFORNIA LABOR CODE § 226 and 1174**</u>
<u>**FAILURE TO PROVIDE ACCURATE WAGE STATEMENTS**</u>

214.   Plaintiffs re-allege and incorporate all previous paragraphs herein.

215.   Labor Code §§ 226 and 1174 provide that every employer shall, semi-monthly or at the time of payment of wages, furnish each employee, either as a detachable part of the check or separately, an accurate, itemized statement in writing showing the total hours worked, and the applicable hourly rates and corresponding total number of hours worked.

216.   At all relevant times, Defendant failed to maintain proper records and furnish Plaintiffs and the California Class members, either semi-monthly or at the time of each payment of wages, an accurate, itemized statement conforming to the requirements of Labor Code §§ 226 and 1174.

217.   At all relevant times, Defendant failed to furnish Plaintiffs and the California Class members with accurate wage statements in writing, showing: (1) gross wages earned; (2) total hours worked by each respective employee; (3) all deductions; (4) net wages earned; (5) the inclusive dates of the period for which the employee is paid; (6) the name of the employee and only the last four digits of his or her social security number or an employee identification number; (7) the name and address of the legal entity that is the employer; and (8) all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate.

COLLECTIVE & CLASS COMPLAINT AND JURY DEMAND

218. Plaintiffs are informed and believe that Defendant knew or should have known that Plaintiffs and the California Class members were entitled to receive wage statements compliant with Labor Code § 226 and 1174, and that Defendant willfully and intentionally failed to provide Plaintiffs and the Class members with such accurate, itemized statements showing, for example, accurate hours and overtime calculations.

219. Wherefore Plaintiffs demand that Defendant pay each and every California Class member fifty dollars ($50.00) for the initial pay period in which the violation occurred and one hundred dollars ($100) for each subsequent violation, up to a maximum of four thousand dollars ($4,000.00) pursuant to Labor Code § 226, as well as reasonable attorneys' fees and costs.

## COUNT VI

## VIOLATION OF CALIFORNIA LABOR CODE §§ 226.2 AND 226.7
## FAILURE TO PERMIT AND AUTHORIZE PAID REST PERIODS

220. Plaintiffs repeat and incorporates herein by reference each and every allegation set forth above, as though fully set forth herein.

221. Pursuant to the IWC wage orders applicable to Plaintiffs and Class Members' employment by Defendant, "Every employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period…. [The] authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours worked or major fraction thereof…. Authorized rest period time shall be counted as hours worked, for which there shall be no deduction from wages." Labor Code §§ 226.2 and 226.7(a) prohibits an employer from requiring any employee to work during any rest period mandated by an applicable order of the IWC.

222. Defendant was required to authorize and permit employees such as Plaintiffs and California Class Members to take paid rest periods, based upon the total hours worked at a rate of ten (10) minutes net rest per four (4) hours, or major fraction thereof, with no deduction from wages. Despite said requirements of the IWC wage orders

applicable to Plaintiffs and California Class Members' employment by Defendant, Defendant failed permit and authorize Plaintiffs and Class Members, to take paid ten (10) minute rest periods for every four (4) hours worked, or major fraction thereof. Labor Code § 226.2, *et. seq*.

223.   As a result of Defendant's commission only compensation scheme, Defendant failed to permit and authorize paid rest periods.   Such a commission only compensation scheme does not provide for minimum wages to be paid during rest periods and therefore makes it impossible for Defendant to comply with Labor Code § 226.2 and 226.7 to permit and authorize paid rest periods to Plaintiffs and Class Members.

224.   For the four (4) years preceding the filing of this lawsuit, Defendant failed to provide Plaintiffs and California Class Members the required paid rest periods pursuant to the IWC wage orders applicable to Plaintiffs and Class Members' employment by Defendant and Labor Code §§226.2 and 226.7 and applicable IWC Wage Orders.

225.   As a proximate result of the aforementioned violations, Plaintiffs and Class Members have been damaged in an amount according to proof at time of trial.

226.   Pursuant to Labor Code §§ 226.2 and 226.7, Plaintiffs and California Class Members are entitled to recover one (1) hour of premium pay for each day in which a paid rest period was not provided.

## COUNT VII

## VIOLATION OF LABOR CODE § 2802

## FAILURE TO INDEMNIFY EMPLOYEES' EXPENSES AND LOSSES

227.   Plaintiffs re-allege and incorporate all previous paragraphs herein.

228.   California Labor Code § 2802 provides that an employee shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties.

229.   During the Relevant times, Defendants knowingly and willfully violated California Labor Code § 2802 by failing to pay Plaintiffs and members of the California Class  employed by Defendants all expenses and losses owed as alleged

COLLECTIVE & CLASS COMPLAINT AND JURY DEMAND

herein. Defendants are therefore liable to Plaintiffs and members of the California Class for expenses and losses incurred in direct consequence of the discharge of Plaintiffs' duties.

230.   Plaintiffs, individually and on behalf of the members of the California Class, respectfully request that the Court award all expenses and losses due, and the relief requested below in the Prayer for Relief.

## COUNT VIII

## VIOLATION OF BUSINESS AND PROFESSIONS CODE, § 17200, *et seq.*

231.  Plaintiffs re-allege and incorporate all previous paragraphs herein.

232.  Defendant engaged and continues to engage in unfair business practices in California by practicing, employing and utilizing the unlawful practices described above, including (a) misclassifying Agents as independent contractors; (b) making unlawful deductions to Agents' paychecks; (c) requiring Agents to work overtime without lawful premium compensation; (d) failing to pay Agents the minimum wage required by state and federal law; (e) failing to provide lawful meal breaks or premium compensation in lieu thereof; (f) failing to provide lawful rest break or premium compensation in lieu thereof; and (f) failing to provide accurate, itemized wage statements.

233. In addition, the conduct alleged in each of the previously stated causes of action constitute an unlawful and unfair business practice within the meaning of Business & Professions Code § 17200, *et seq.*

234. As a result of Defendant's conduct, Plaintiffs and the Class have been harmed as described in the allegations set forth above.

235. The actions described above, constitute false, unfair, fraudulent and deceptive business practices within the meaning of California Business & Professions Code § 17200, *el seq.* By and through such unfair, unlawful and/or fraudulent business practices, Defendant obtained valuable property, money and services from Plaintiffs and the California Class, and have deprived Plaintiffs and the California Class fundamental rights and privileges guaranteed to all employees under California law.

COLLECTIVE & CLASS COMPLAINT AND JURY DEMAND

236. Defendant was unjustly enriched by the policies and practices described herein, and those policies and practices conferred an unfair business advantage on Defendant over other businesses providing similar services which routinely comply with the requirements of California law.

237. Plaintiffs seek, on their own behalf, and on behalf of the putative California Class members, full restitution of all monies withheld, acquired and/or converted by Defendant by means of the unfair practices complained of herein, as necessary and according to proof, and/or disgorgement of all profits acquired by Defendant by means of the acts and practices described herein.

238. Plaintiffs seek, on their own behalf, and on behalf of other California Class members similarly situated, an injunction to prohibit Defendant from continuing to engage in the unfair business practices complained of herein. Defendant's unlawful conduct, as described above, unless and until enjoined and restrained by order of this Court, will cause great and irreparable injury to Plaintiffs and all Class members in that Defendant will continue to violate these California laws unless specifically ordered to comply with the same. This expectation of future violations will require current and future employees to repeatedly and continuously seek legal redress in order to gain compensation to which they are entitled under California law. Plaintiffs have no other adequate remedy at law to insure future compliance with the California labor laws and wage orders alleged to have been violated herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs on their own behalf and on the behalf of the putative Collective and Class members, request judgment as follows:

a.  Certifying this case as a collective action in accordance with 29 U.S.C. § 216(b) with respect to the FLSA claims set forth above;

b.  Designating the named Plaintiffs as Representative of the proposed FLSA collective;

COLLECTIVE & CLASS COMPLAINT AND JURY DEMAND

c.   Ordering Defendant to disclose in computer format, or in print if no computer readable format is available, the names and addresses of all those individuals who are similarly situated, and permitting Plaintiffs to send notice of this action to all those similarly situated individuals including the publishing of notice in a manner that is reasonably calculated to apprise the potential class members of their rights under the FLSA;

d.   Certifying the proposed Rule 23 Class;

e.   Designating Plaintiffs as representatives of the proposed Rule 23 Class;

f.   Appointing James Hawkins, APLC and Sommers Schwartz, P.C. as Class Counsel;

g.   Declaring that Defendant willfully violated the Fair Labor Standards Act and its attendant regulations as set forth above;

h.   Granting judgment in favor of Plaintiffs and against Defendant and awarding the amount of unpaid overtime wages calculated at the rate of one and one-half (1.5) of Plaintiffs' regular rate multiplied by all off-the-clock hours that Plaintiffs worked in excess of eight (8) hours per day and/or forty (40) hours per week for the past four years;

i.   Granting judgment in favor of Plaintiffs and against Defendant and awarding the amount of unpaid minimum wages based on the applicable state and federal minimum wage owed for the past four years;

j.   Awarding liquidated damages in an amount equal to the amount of unpaid overtime and minimum wages found due and owing;

k.   For statutory and civil penalties pursuant to Labor Code §§ 225.5, 226(e), 226.3, and 226.7;

l.   For disgorgement and restitution to Plaintiffs and other similarly effected Class members of all funds unlawfully acquired by Defendant by means of any acts or practices declared by this Court to violate the mandate established by California Business and Professions Code § 17200, *et seq.*;

m.   For the appointment of a receiver to receive, manage and distribute any and all funds disgorged from Defendant and determined to have been wrongfully

acquired by Defendant as a result of violations of California Business and Professions Code § 17200, *et seq.*;

n.    For an injunction prohibiting Defendant from engaging in the unfair business practices complained of herein;

o.    For an injunction requiring Defendant to give notice to persons to whom restitution is owing of the means by which to file for restitution;

p.    For actual damages or statutory penalties according to proof as set forth in California Labor Code §§ 226, 1174, and IWC Wage Order No. 7, § 7(A) related to record keeping;

q.    For an order requiring Defendant to show cause, if any there be, why they should not be enjoined and ordered to comply with the applicable California Industrial Welfare Commission wage orders related to record keeping for Defendant's employees related to same; and for an order enjoining and restraining Defendant and its agents, servants and employees related thereto;

r.    For pre-judgment interest as allowed by California Labor Code §§ 218.6, 1194 and 2802(b) and California Civil Code § 3287 and other statutes;

s.    Awarding civil penalties pursuant to California Labor Code § 2698, *et seq.*;

t.    For reasonable attorneys' fees, expenses, and costs as provided by the FLSA, California Labor Code §§ 226(e) and (g), 1194, 2802 and California Code of Civil Procedure § 1021.5; and

u.    For such other and further relief the Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs, Monique Dudley and Noreen Costa, individually and on behalf of all others similarly situated, by and through their attorneys, hereby demand a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure and the court rules and statutes made and provided with respect to the above entitled cause.

COLLECTIVE & CLASS COMPLAINT AND JURY DEMAND

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully Submitted,

Dated: May 1, 2018                  JAMES HAWKINS, APLC

 /s/ Gregory Mauro
James Hawkins, SBN 192925
Gregory Mauro SBN 222239
JAMES HAWKINS, APLC
9880 Research Drive, Suite 200
Irvine, CA. 92618
Tel: 949-387-7200

*Local Counsel*

SOMMERS SCHWARTZ, P.C.
Kevin J. Stoops (*pending pro hac vice*)
kstoops@sommerspc.com
Charles R. Ash IV (*admitted pro hac vice*)
crash@sommerspc.com
SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Telephone: (248) 355-0300
Facsimile: (248) 436-8453

*Counsel for Plaintiffs and Proposed Class and Collective Members*

COLLECTIVE & CLASS COMPLAINT AND JURY DEMAND

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

**MONIQUE DUDLEY** and
**NOREEN COSTA**, individually and
on behalf of all other similarly situated,

                 Plaintiffs,

v.

**TRUECOVERAGE, LLC,**

              Defendant.

Case No.:

**CONSENT TO JOIN**
**COLLECTIVE ACTION**

## Consent To Join Form

I work or worked for TrueCoverage, LLC, ("TrueCoverage") on or after April 30, 2015 as an at home insurance sales agent ("Agent") misclassified as an independent contractors and worked uncompensated overtime.

I choose to participate in the lawsuit titled Monique Dudley and Noreen Costa v. TrueCoverage, LLC to recover unpaid overtime wages under the federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. §216(b), and other relief under state and federal law.

I choose to be represented in this action by the named plaintiffs and Sommers Schwartz, P.C. and James Hawkins, APLC (collectively, "Plaintiffs' Counsel"). I agree to be bound by their decisions in the litigation and by any adjudication of this action by a court, whether it is favorable or unfavorable. I understand that reasonable costs expended by Plaintiffs' Counsel on my behalf will be deducted from any settlement or judgment amount on a pro-rata basis among all other plaintiffs. I understand that Plaintiffs' Counsel will petition the Court to award them attorneys' fees from any settlement or judgment.

I also consent to join any separate or subsequent action to assert my claims against TrueCoverage, and/or any related entities or persons potentially liable.

Signature: _____

Print Name:   Monique Dudley

Date:       04/30/2018

# EXHIBIT 2

1

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

2

3

| | |
|---|---|
| **MONIQUE DUDLEY** and **NOREEN COSTA**, individually and on behalf of all other similarly situated, | Case No.: |
| Plaintiffs, | **CONSENT TO JOIN COLLECTIVE ACTION** |
| v. | |
| **TRUECOVERAGE, LLC,** | |
| Defendant. | |

4

5

6

7

8

9

### Consent To Join Form

10

I work or worked for TrueCoverage, LLC, ("TrueCoverage") on or after April 30, 2015 as an at home insurance sales agent ("Agent") misclassified as an independent contractors and worked uncompensated overtime.

11

12

I choose to participate in the lawsuit titled Monique Dudley and Noreen Costa v. TrueCoverage, LLC to recover unpaid overtime wages under the federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. §216(b), and other relief under state and federal law.

13

14

15

I choose to be represented in this action by the named plaintiffs and Sommers Schwartz, P.C. and James Hawkins, APLC (collectively, "Plaintiffs' Counsel"). I agree to be bound by their decisions in the litigation and by any adjudication of this action by a court, whether it is favorable or unfavorable. I understand that reasonable costs expended by Plaintiffs' Counsel on my behalf will be deducted from any settlement or judgment amount on a pro-rata basis among all other plaintiffs. I understand that Plaintiffs' Counsel will petition the Court to award them attorneys' fees from any settlement or judgment.

16

17

18

19

I also consent to join any separate or subsequent action to assert my claims against TrueCoverage, and/or any related entities or persons potentially liable.

20

21

22

Signature: _____

23

24

Print Name: _____Noreen costa_____

25

Date: _____4/30/2018_____

26

27

28

1

# EXHIBIT 3



# Independent Agent Agreement ("Agreement")

This Agreement ("Agreement") dated _____, 20__, ("Effective date") between _____ ("Agent") and TrueCoverage, LLC ("Company"), sets forth the terms and conditions under which "Agent" shall perform certain services for the Company. Agent and Company may also be referred to individually as a "party" and together as the "parties."

## 1 APPOINTMENT

1.1 The Company hereby appoints Agent (and any of its Producers/Sub-brokers if Agent is an Agency) to solicit, at its own expense, new and renewal applications for insurance contracts ("Policy" or "Policies") as listed in **Schedule A,** as amended from time to time.

## 2 DUTIES OF AGENT

2.1 If Agent is Agency, then it shall be responsible for assuring that all of its Producers comply with the following duties as well as the Agent.

2.2 Agent will comply with all laws and regulations which relate to this Agreement and shall indemnify and hold the Company harmless for its failure to do so. Agent shall maintain in good standing, at its own cost, licenses required by all applicable statutes and regulations. Agent shall provide a copy of its current license(s) to the Company. Upon Agent's loss or failure to procure and maintain such licenses as may be required by law, this Agreement shall terminate automatically in accordance with paragraph 7.3. Agent shall comply with all appointment requirements of the underwriters of any of the products set forth on **Schedule A.** If Agent is a business entity, Agent shall ensure all of its employees who sell Company's products are properly licensed and appointed, including appointments to Company's underwriters, a State Department of Insurance, a supervising agent, or any other person or entity as required by applicable law or statute.

2.3 Agent may not waive any provision of the Company's underwriting standards or the insurers' underwriting standards without the Company's express prior written authorization. Any questions about the Company's underwriting standards shall be referred to the Company.

2.4 Agent will comply with the Company's rules and regulations relating to the preparation of proposals and the completion and submission of applications. As a material part of the consideration for the making of this Agreement by the Company, Agent agrees that there will be made no representations whatsoever with respect to the nature or scope of the benefits of the Policies sold except through and by means of the written material either prepared and furnished to Agent for that purpose by the Company or approved in writing by the Company prior to its use. Agent shall have no authority and will not make any oral or written alteration, modification, or waiver of any of the terms or conditions of any Policy whatsoever.

2.5 Agent warrants that Agent will diligently and to the best of its ability ensure that the facts set forth by any applicant in any application it solicits are true and correct.

2.6 Agent will conduct itself so as not to affect adversely the business, good standing, and reputation of the Company.

2.7 Agent agrees not to employ or make use of any advertisement in which the Company's (or its affiliate's) name or its registered trademarks are employed without the prior written approval and consent of the Company. Upon request of Agent during the term of this Agreement, the Company shall make available for Agent's use, standard advertising prepared for the Company. Agent may add, at Agent's expense, to the standard advertising only its business name, business address, agent number and telephone number, as provided for in the advertising. No deletions or changes in the advertising copy are permissible.



Company may furnish Agent a URL link(s) to Company's products that shall display Agent's name and contact information, and shall be embedded with the unique identification number Company has assigned to Agent.  Agent may post this URL link(s) on its proprietary Web pages that are designed for offering, disseminating, and selling health insurance products. Agent may not send said URL link(s) to any third party, or otherwise facilitate said URL link(s) being posted on a third party's Web page, or post said URL link(s) on any proprietary Web page of Agent not designed for offering, disseminating, or selling health insurance products, without written consent of Company.

Agent shall act solely as an independent contractor, and as such, shall control in all matters its time and effort in the placement of the Policies offered hereunder. Nothing herein contained shall be construed to create the relationship of employer and employee between 'Agent' and 'Company'.

2.8 Agent shall indemnify and hold the Company and its officers, agents and employees harmless from all expenses, costs, causes of action, claims, demands, liabilities and damages, including reasonable attorney's fees, resulting from or growing out of any unauthorized act or transaction or any negligent act, omission or transaction by Agent or employees of Agent.

2.9 Agent shall maintain in force insurance coverage against wrongful acts and errors and omissions of Agent, its agents and employees with respect to the services performed hereunder. Such insurance coverage shall be in the amount of at least $100,000 for the sale of individual plans listed on **Schedule A** and at least $250,000 for the sale of group plans listed in **Schedule A**."

2.10 Agent shall promptly prepare and transmit to the Company, in a format acceptable to the Company, such reports as the Company may reasonably require from time to time, including reports of all information necessary for the Company to comply with all applicable laws, rules, and regulations or to manage its business.

2.11 Whenever any activity under this Agreement would cause a producer to be considered a "Business Associate" as defined in 45 C.F.R. section 160.103, the following restrictions in conjunction with any additional statutory requirement will apply to all uses and disclosures of all Protected Health Information:

2.11.1  Business Associate shall not use or further disclose Protected Health Information other than as permitted or required by this Agreement or as Required By Law.  Business Associate shall not sell Protected Health Information.  Business Associate shall not use or disclose Genetic Information except as permitted by 45 C.F.R. § 164.502(a) (5)(i).
2.11.2 Business Associate shall use appropriate safeguards to prevent use or disclosure of Protected Health information.
2.11.3 Business Associate shall comply with the Security Rule, including developing and implementing written information security policies and procedures.



## 3 DUTIES OF THE COMPANY

3.1   The duties of the Company shall vary depending upon the specific product being sold by Agent.  For all products, the Company will provide approved brochures and other approved marketing materials for sales campaigns.  The Company will deliver to the customer all insurance policies, certificates and related correspondence or similar documents, in accordance with Company procedures.  The Company shall respond in a reasonable and timely manner to inquiries and questions about the product.  The Company shall maintain reasonable accounting, administrative, and statistical records in accordance with prudent standards of insurance record keeping, including premium, sale or effective date, and any other records needed to verify coverage, pay claims, or underwrite the company insurance products, of any insured participant covered under the policies.

## 4 RESERVATION OF RIGHTS

4.1 The Company reserves the right to reject any and all applications for its Policies submitted by Agent.

4.2 The Company reserves the right to discontinue writing or offering any of the Policies which are or become subject to this Agreement upon sixty (60) days' notice to Agent (or the number of days required by law in the Agent's state of domicile).

## 5 MAINTENANCE OF RECORDS

5.1 Company and Agent each shall maintain at their respective principal office, for the duration of this Agreement and for seven (7) years thereafter, a system of files containing this Agreement and books and records of all transactions relating to this Agreement, including records of transactions with individual insureds.  These books and records shall be maintained in accordance with prudent standards of insurance record keeping.

5.2 The Company, its employees, or authorized representatives may have unrestricted access to records for the Policies, and may audit, inspect and examine at reasonable times, upon reasonable notice and during regular business hours at Agent's place of business, all books and records, and may obtain copies of such books and records at its own expense.  Company and Agent acknowledge that each shall accept automated files in lieu of hard copy files as permitted by law.

5.3 Agent shall fully cooperate with any audit or examination by any Department of Insurance or other authorized agencies and shall allow access to books and records maintained by either of them pursuant to this Agreement.  Each shall notify the other within one [1] business day of any such audit or examination.

5.4 All information related to Policies underwritten by Insurers and persons covered by those Policies, including, but not limited to, lists of insureds' names, addresses, other relevant information, application (s), master policies, files, documents and correspondence are the property of the Company subject at all times to its control.  Sales literature, computer software and other property, tangible and intangible, which the Company furnishes to Agent, are the property of the Company subject at all times to its control.  Any materials prepared by the Company which relate to Polices underwritten by an Insurer shall be subject to the Company's control.  All property of the Company shall be returned to or provided to it upon its written request.  If Agent's ability to perform under this Agreement shall be affected by the return of such property, then it shall not be held in breach for its failure to perform resulting from such return.  Except as provided in paragraph 5.5, Agent may not duplicate the Company's materials or use them in any way other than as authorized by the Company and shall secure the Company's approval prior to releasing any information contained in this property to parties outside this Agreement.

5.5 During the term of the Agreement, any extensions of it and for three (3) years thereafter, the Company shall keep strictly secret and confidential any Confidential Information about Agent, and Agent shall keep strictly secret and confidential any Confidential Information about the Company.  "Confidential Information" shall include information, written or unwritten, which pertains in any way to financial or accounting matters, business production, methods of business operations, marketing, strategic planning or proprietary information of any kind or nature whatsoever, including trade secrets or know-

**truecoverage™**
Insurance Marketplace

how. Confidential Information does not include information that: (i) is already known to the recipient at the time of disclosure to it; (ii) is in the public domain or subsequently becomes publicly available; (iii) is provided to the recipient by a third party who is under no such obligation of confidentiality; or (iv) is independently developed by the recipient. Each party shall take necessary and reasonable precautions to prevent unauthorized disclosure of Confidential Information and shall require all of its officers, employees, and other personnel to whom it is necessary to disclose the same, or to whom the same has been disclosed, to keep this Confidential Information secret and confidential. It is understood, however, that certain "Confidential Information" may be required to be filed with State and Federal regulatory agencies in accordance with their reporting requirements. Neither party shall make use of the name or service mark(s) of the other, including use of the name or service mark(s) of any marketing, enrollment, or other public relations material without prior written approval of the other party.

5.6 Agent recognizes that in the performance of its obligations under this Agreement, it may be party to confidential information about individuals covered by Policies underwritten by an Insurer. Information that identifies an individual covered by the Policy is confidential. During the time confidential information is in Agent's custody or control, it shall take all reasonable precautions to prevent disclosure or use of the information for a purpose unrelated to administration of insurance benefits. Agent may disclose confidential information only:

     5.6.1 in response to a court order;

     5.6.2 for an examination conducted by the Commissioner of Insurance;

     5.6.3 To the other party; or

     5.6.4 with the written consent of the identified individual or his or her legal representative.

**6 COMPENSATION**

6.1 Compensation for each policy written hereunder shall be made by the Company to Agent in accordance with **Schedule A**, attached hereto and incorporated herein by reference. The Company shall not be liable for any payments due to agents of Agent during the term of this Agreement or thereafter.

6.2 Compensation due under this Agreement shall be paid to Agent within 30 days from the end of each calendar quarter in which the Company receives premium with respect to its Policies or as may otherwise be agreed upon in writing.

6.3 A party shall have a lien and right of offset on all sums payable hereunder or otherwise for any debt due from the other party or the other party's agents. Indebtedness under this Agreement or under any other agreement between the parties shall constitute a general indebtedness survive the termination of this Agreement. A party shall not be limited to recovery of payment of this indebtedness from sums payable under this Agreement.

6.4 Under all circumstances, the Company shall have the right to offset overpayments to Agent against amounts due to Agent.

**7 EFFECTIVE DATE, TERM AND TERMINATION**

7.1 This Agreement shall commence on the effective date first stated above and shall continue in force until terminated pursuant to this Article.

7.2 Except as otherwise provided herein, this Agreement will begin on the effective date and terminate twelve (12) months thereafter, at which time it will automatically renew for subsequent one (1) year periods unless either party gives written notice a least sixty (60) days prior to termination date or unless termination is otherwise provided herein. The parties expressly agree that subject to the provisions of paragraph 7.3 and 7.4, any termination of this Agreement will not in any fashion terminate the obligations of the parties with respect to business written during the term of this Agreement. Subject to the above, the obligations of the parties with respect to such business shall remain in full force and effect until the



cancellation or termination date of any such Policy.

Notice, as provided herein, is to be sent to:

If to the Company:

> **TrueCoverage, LLC**
> 2400 Louisiana Blvd SE.
> Building 3
> Albuquerque, NM 87110

If to the Agent:

Agent or Agency Name: _____

Address: _____

City, State, ZIP: _____

Phone Number: _____

Fax Number: _____

Email: _____

Checks Payable To: _____
(Corresponding to name as reflected on attached W-9 and license)

Website (if applicable): _____

 All notices given under this Agreement must be in writing and sent via a verifiable method to the party receiving notice at the address indicated above or such address as may have been communicated most recently in writing to the sending party.

7.3 This Agreement will terminate automatically upon the occurrence of any of the following events, and upon such occurrence the parties shall be obligated to make only those payments the right to which accrued to the date of termination:

7.3.1 Suspension or revocation of a party's license(s) in any state(s) in which both parties are working together;

7.3.2 Conviction of a felony by Agent and/or its employees;

7.3.3 Sale or transfer, or other substantial changes are made in the ownership of Agent's Agency;

7.3.4 Cancellation or expiration of Errors and Omissions insurance required of Agent by this Agreement;

7.3.5 Misappropriation (or failure to remit) any funds or property due the Company from Agent;

7.3.6 Determination that Agent is not in compliance with Company underwriting guidelines or the terms of this Agreement and Agent has failed to correct the problem within 10 days of the Company providing written notice of same;

7.3.7   The filing of a petition in bankruptcy by a party or commencement of any voluntary insolvency proceeding;

**truecoverage™**
Insurance Marketplace

7.3.8   The filing of an involuntary petition in bankruptcy or commencement of any involuntary insolvency proceeding not cured by dismissal by the party within sixty (60) days of filing.

7.4 In the event of a material breach by a party to this Agreement, the non-breaching party may terminate this Agreement after providing thirty (30) days written notice to the breaching party to cure such breach. Upon such occurrence, a party shall be obligated to make only those payments the right which accrued to the date of termination.

## 8. GENERAL PROVISIONS

8.1 Failure of either party to insist upon the performance of any of the terms of this Agreement or to declare a forfeiture or termination in the event of non-performance by the other party shall not constitute a waiver   of performance required hereunder.

8.2 No assignment, transfer or disposal of any interest that a party may have pursuant to this Agreement shall   be made at any time without prior written approval of the other party. Notwithstanding the foregoing, Company may assign any and all interests under this Agreement to a parent or affiliate, or due to merger or acquisition without the consent of Agent.

8.3 This Agreement shall be binding upon the administrators and executors, successors and permitted assignees of the parties hereto.

8.4 No Amendment or modification of this Agreement shall be valid, or of any force or effect, unless the same be in writing and acknowledged and signed by the Company and Agent subject to the Notice provisions as set out in paragraph 7.2.

8.5 Any disputes, claims or counterclaims arising from or relating to this Agreement shall be subject to and shall finally and exclusively be resolved by binding arbitration under the rules of conciliation and arbitration of the American Arbitration Association. Each party shall appoint an arbitrator, and the two arbitrators thus selected shall designate a third. If either party fails to appoint an arbitrator within thirty (30) days after receipt of notice of the appointment by the other party of its arbitrator, or if the arbitrators selected by the parties fail to appoint a third within thirty (30) days after both have been appointed, then the American Arbitration Association shall have the power, on the request of either party, to make the appointments which have not been made as contemplated above. The costs of arbitration shall be borne equally by the parties.

8.6 This Agreement shall be construed for all purposes and shall be interpreted and enforced in accordance with the laws of New Mexico. The parties agree the site of this contract is the State of New Mexico. Each chooses the State of New Mexico as it choice of forum for any suit or other action which may be filed to enforce all or any part of this Agreement or for damages arising directly or indirectly from it.

8.7   The terms and provisions of this Agreement shall be severable. If any provision of this Agreement shall be adjudged invalid or unenforceable under applicable law, such part may be reformed by a court of competent jurisdiction sitting in equity. The parties shall continue to abide by all other or remaining terms of this Agreement, and if the court declines to revise the offending provision, the parties shall strive to deal with each other in a fair and reasonable manner.

8.8   If applicable, the requirements of 41 CFR §§ 60-1.4(a), 60-250.5 (a), 60-300.5(a), 60-741.5(a), and 29 CFR Part 471, Appendix A to Subpart A, are incorporated herein by reference.



This Agreement constitutes the entire agreement between the parties with respect to its matter.

IN WITNESS WHEREOF, intending to be legally bound hereby, the parties hereto have executed this Agreement.

**Company:**    <u>TrueCoverage, LLC</u>

**Name:**    <u>K P Hari</u>

Designation:    <u>Chief Financial Officer</u>

Signature:    _____

Date:    _____

**Agent:**    _____

Signature:    _____

Date:    _____

**truecoverage™**
Insurance Marketplace

<u>SCHEDULE A</u>

**Product Compensation Schedule**

**Requirements**

Agent will also be required to furnish upon Company's request copies of State licenses for those States where products are to be marketed, negotiated and sold.

<u>Compensation</u>

A) Medicare Supplements $10 an hour while on dialer – dialing or on phone talking

B) 5%  of premium per Medicare sale with 12 month advance that goes active. 5% Residual per month after first year.

C) $20 per Basic Dental member that goes active

D) $35 per Premium Dental member that goes active

E) $10 Per vision member that goes active

F) $50 per Final Expense plan of premium $51 or under for AIG or Gerber

G) $80 per Final Expense plan of premium above $51 for AIG or Gerber

H) $70 per Final Expense plan of premium $51 or under for MOO, Foresters, Cigna, Prosperity and any other Level carrier.

I) $120 per Final Expense plan of premium above $51 for MOO, Foresters, Cigna, Prosperity and any other Level carrier.

J) $30 Per PDP plan

K) $100 Per Medicare advantage enrollee for new to Medicare enrollee

L) $60 Per Medicare advantage enrollee for existing enrollee

M) $40 per ACA member enrolled with payment information

N) $10 per ACA member enrolled without payment information

O) $80 per Short-term plan

P) ACA sales campaign is strict commission with no hourly pay



# BASE PAY DEFINED

A) We will be working from a dialer which tracks reporting.
B) There is Time Logged in
C) Time paused
D) Time dispositioning leads
E) You will be expected to Log in at 10 am eastern time and log out at 7 pm Eastern time.  (unless we have an arrangement)
F) The way your hours paid will be based from will be your Hours Logged in minus Time Paused and Time dispositioning leads.   You will be allotted every day for full time employees 30 minutes of Paused time and 15 minutes of Dispositioned Time pay.  Meaning that you will be paid for those 45 minutes.  Anything over that, you don't get paid for that Paused or Dispositioned time pay.  **EXAMPLE: You are logged on 9 hours.  Paused 2 hours and Call Disposition time 1 hours.   You are allotted 45 minutes out of those 3 hours to get paid.  So that is 2 hours and 15 minutes Minus the 9 hours logged on and that means you get paid for 6 hours and 45 minutes.**
G) Since this is a remote at-home position, we don't have the luxury to be looking over your shoulders, which gives you the broker a lot more flexibility and freedom.   We have to be able to know that you are in the system making dials for us to compensate you fairly.

# BONUS PAY

A) 15 Medicare sales in a month that go active $250 Bonus
B) 20 Medicare sales in a month that go active $400 Bonus
C) 25 Medicare sales in a month that go active $650 Bonus
D) 30 Medicare sales in a month that go active $1000 Bonus
E) 10 Final Expense sales in a month that go active $300 Bonus
F) 15 Final Expense sales in a month that go active $500 Bonus
G) 5 Dental Sales in a month that go active $150 Bonus
H) 10 Dental Sales in a month that go active $350 Bonus
I) 75 ACA policies in a pay period $300 bonus (minimum 75% with pay information and/or $0 premium to qualify)
J) 100 ACA policies in a pay period $500 bonus (minimum 75% with pay information or $0 premium to qualify)
K) 125 ACA policies in a pay period $500 bonus (minimum 75% with pay information or $0 premium to qualify)
L) 20 Dental and/or Vision policies sold in a pay period $200 bonus
M) 30 Dental and/or Vision policies sold in a pay period $350 bonus



# CHARGEBACK POLICY

A) Any Medicare/Final Expense sales that cancel within first months after going active will be fully charged back.
B) Medicare/Final Expense Sales that cancel from months 2 to 6 will be charged back at 50%
C) Medicare/Final Expense Sales that cancel from months 6-12 will be charged back at 25%
D) Any ACA sales that are cancelled within first 2 months of active date full chargeback

# WHEN DO WE GET PAID?

A) We get paid on every 1st and 15th of the month.
B) Hourly Base pay will be paid out on every 1st and 15th of the month.
C) Bonus and Commissions will be paid out on the 15th along with Hourly Base Pay.
D) Bonus and Commissions are gathered from all the sales that went active the previous month and will be paid on following 15th. **Example: If you sell 14 Medicare plans and 5 Final Expense sales and 2 Dentals that went active in September and you hit a bonus. All the commissions and bonuses for the month of September will be paid out in October.**
E) Hourly Base pay will be tallied from the hours worked from the 1st to the 15th and paid out on the following 1st. All Hourly base pay will be tallied from the hours worked from the 16th to the end of the month and paid out on the following 15th.
F) ACA sales will be paid on every 1st and 15th of the month. Commission from previous pay period will be paid on following 1st or 15th.

**Note:**

1. All payouts are based on actual commissions received by the Company.
2. If Company agrees to any advance payout, Agent will be responsible for paying the Company back any chargebacks or related cancellations for which the advance payout was made for. The company reserves the right to adjust the same from any future or pending payout to the Agent.
3. Invoicing every 2 weeks. All sales made from 1st – 15th will be paid out on following first. All sales from 16th to end of month will be paid out on following 15th.

# EXHIBIT 4

| Form **1099-MISC** ☐ CORRECTED (if checked) | Form **1099-MISC** 2017 Miscellaneous Income | OMB No. 1545-0115 39-1908847 Department of Treasury – IRS |
|---|---|---|

PAYER'S name, street address, city, state, ZIP code, and telephone no.

TrueCoverage LLC
2400 Louisiana Blvd NE
Bldg 3
Albuquerque NM 87110

| | | |
|---|---|---|
| **1** Rents $ 0.00 | **2** Royalties $ 0.00 | **3** Other income $ 0.00 |
| **4** Fed. inc. tax withheld $ 0.00 | **5** Fishing boat proceeds $ 0.00 | **6** Medical and health care payments |
| **7** Nonemployee compensation $ 2870.00 | **8** Substitute payments in lieu of dividends/interest $ 0.00 | **9** Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ☐ |
| **10** Crop insurance proceeds $ | **11** | **12** |

PAYER'S Federal identification number 472770431

RECIPIENT'S identification number

RECIPIENT'S name, address, and ZIP code

Costa, Noreen

| | | |
|---|---|---|
| **13** Excess golden parachute payments $ | **14** Gross proceeds paid to an attorney $ 0.00 | **15a** Section 409A deferrals $ |
| | | **15b** Section 409A income $ |
| **16** State tax withheld $ 0.00 $ 0.00 | **17** State/Payer's state no. | **18** State income $ 0.00 $ 0.00 |

Account number (see instructions)

**Copy B For Recipient** (keep for your records)
This is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if this income is taxable and the IRS determines that it has not been reported.

---

| Form **1099-MISC** ☐ CORRECTED (if checked) | Form **1099-MISC** 2017 Miscellaneous Income | OMB No. 1545-0115 39-1908847 Department of Treasury – IRS |
|---|---|---|

PAYER'S name, street address, city, state, ZIP code, and telephone no.

TrueCoverage LLC
2400 Louisiana Blvd NE
Bldg 3
Albuquerque NM 87110

| | | |
|---|---|---|
| **1** Rents $ 0.00 | **2** Royalties $ 0.00 | **3** Other income $ 0.00 |
| **4** Fed. income tax withheld $ 0.00 | **5** Fishing boat proceeds $ 0.00 | **6** Medical and health care payments |
| **7** Nonemployee compensation $ 2870.00 | **8** Substitute payments in lieu of dividends/interest $ 0.00 | **9** Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ☐ |
| **10** Crop insurance proceeds $ 0.00 | **11** | **12** |

PAYER'S Federal identification number 472770431

RECIPIENT'S identification number

RECIPIENT'S name, address, and ZIP code

Costa, Noreen

| | | |
|---|---|---|
| **13** Excess golden parachute payments $ | **14** Gross proceeds paid to an attorney $ 0.00 | **15a** Section 409A deferrals $ |
| | | **15b** Section 409A income $ |
| **16** State tax withheld $ 0.00 $ 0.00 | **17** State/Payer's state no. | **18** State income $ 0.00 $ 0.00 |

Account number (see instructions)

Copy 2
To be filed with recipient's state income tax return, when required.

**Noreen Costa**

| | |
|---|---|
| Company | |
| F899 | Period Begin 12/16/2017 |
| Number | Period End 12/31/2017 |
| Social Security # | Check Number -99995603 |
| Hire Date 11/9/2017 | Check Date 1/12/2018 |

Division
Branch
Department 1099
Team

**TrueCoverage LLC**

2400 Louisiana Blvd NE Bldg 3
Albuquerque, NM 87110 505-217-3725

Service Charge Dec 16 thru Dec 31

## Earnings

| Description | Location / Job | Rate | Hours/Pieces | Current | Year To Date |
|---|---|---|---|---|---|
| | | 0.00 | 0.00 | 268.00 | 268.00 |
| 1099 Earnings | | | | | |

## Deductions

| Description | Current | Year To Date |
|---|---|---|
| | 0.00 | 0.00 |
| Fed (S/0) (0.00) | | |
| NetPay 94825XXXX | 268.00 | 268.00 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Total Earnings | | | 0.00 | 268.00 | 268.00 | Total Deductions | 0.00 | 0.00 |
| NET PAY | | 268.00 | Total Direct Deposits | | 268.00 | Check Amount | | 0.00 |

REMOVE DOCUMENT ALONG THIS PERFORATION

**DO NOT ACCEPT THIS CHECK** without confirming presence of Artificial Watermark on back. Other security features are listed on back.

**TrueCoverage LLC**
2400 Louisiana Blvd NE
Bldg 3
Albuquerque, NM 87110

Bank Of America
414 S Matilda Ave, Sunnyvale, CA

35
1210

Check Date 1/12/2018          Check Number  Memo

$************

Pay  *No Dollars and No Cents*

PAY ONLY        00

To the Order of:
1099                    2157  -99995603
Noreen  Costa          NON NEGOTIABLE

Authorized Signature

**TrueCoverage LLC**

2400 Louisiana Blvd NE Bldg 3
Albuquerque, NM 87110 505-217-3725

**Noreen Costa**

| | |
|---|---|
| Company | Period Begin |
| F899 | 12/1/3017 |
| Number | Period End |
| | 12/15/2017 |
| Social Security # | Check Number |
| | -99996033 |
| Hire Date | Check Date |
| 11/9/2017 | 12/29/2017 |

Division

Branch
1099
Department

Team

Service Charge Dec 1st thru Dec30

## Earnings

| Description | Location / Job | Rate | Hours/Pieces | Current | Year To Date |
|---|---|---|---|---|---|
| 1099 Earnings | | 0.00 | 0.00 | 2356.00 | 2870.00 |
| | | | 0.00 | 2356.00 | 2870.00 |
| Total Earnings | | | | 2356.00 | 2870.00 |

## Deductions

| Description | | Current | Year To Date |
|---|---|---|---|
| | | 0.00 | 0.00 |
| Net Pay 94825XXXX | | 2356.00 | 2870.00 |
| | | | |
| Total Deductions | | 2356.00 | 2870.00 |
| Check Amount | | 0.00 | 0.0 |

**NET PAY** 2356.00 **Total Direct Deposits**

REMOVE DOCUMENT ALONG THIS PERFORATION

DO NOT ACCEPT THIS CHECK without confirming presence of Artificial Watermark on back. Other security features are listed on back.

**TrueCoverage LLC**
2400 Louisiana Blvd NE
Bldg 3
Albuquerque, NM 87110

Bank Of America
414 S Matilda Ave, Sunnyvale, CA

35
1210

**Check Date 12/29/2017**   **Check Number  Memo**

Pay *No Dollars and No Cents*

$***********

To the Order of:
1099
**Noreen Costa**

2157  -99996033
NON NEGOTIABLE

PAY 0 00
ONLY CTS CTS

Authorized Signature

**Noreen Costa**

**TrueCoverage LLC**

2400 Louisiana Blvd NE Bldg 3
Albuquerque, NM 87110 505-217-3725

Service Charge Nov 15 thru Nov 30

| | | |
|---|---|---|
| Company | Period Begin | Division |
| F899 | 11/16/2017 | |
| Number | Period End | Branch |
| | 11/30/2017 | 1099 |
| Social Security # | Check Number | Department |
| | -99996454 | |
| Hire Date | Check Date | Team |
| 11/9/2017 | 12/15/2017 | |

## Earnings

## Deductions

| Description | Location / Job | Rate | Hours/Pieces | Current | Year To Date | Description | Current | Year To Date |
|---|---|---|---|---|---|---|---|---|
| 1099 Earnings | | 0.00 | 0.00 | 514.00 | 514.00 | Fed (S/0) (0.00) | 0.00 | 0.00 |
| | | | | | | NetPay 94826XXXX | 514.00 | 514.00 |
| **Total Earnings** | | | 0.00 | 514.00 | 514.00 | **Total Deductions** | 514.00 | 514.00 |
| **NET PAY** | | | 514.00 | **Total Direct Deposits** | 514.00 | **Check Amount** | 0.00 | 0.00 |

REMOVE DOCUMENT ALONG THIS PERFORATION

DO NOT ACCEPT THIS CHECK without confirming presence of Artificial Watermark on back. Other security features are listed on back.

**TrueCoverage LLC**
2400 Louisiana Blvd NE
Bldg 3
Albuquerque, NM 87110

Bank Of America
414 S Matilda Ave, Sunnyvale, CA

35
1210

**Check Date** 12/15/2017    **Check Number  Memo**

$**************

Pay *No Dollars and No Cents*

To the Order of:
1099
**Noreen  Costa**

2157   -99996454
NON NEGOTIABLE

PAY ONLY □ □ CTS CTS

Authorized Signature

# EXHIBIT 5

## TrueCoverage LLC

**onique Dudley**

2400 Louisiana Blvd NE Bldg 3
Albuquerque, NM 87110 505-217-3725

Service Charge Dec 16 thru Dec 31

| | | |
|---|---|---|
| Company | Period Begin | Division |
| F889 | 12/16/2017 | |
| Number | Period End | Branch |
| | 12/31/2017 | 1099 |
| Social Security # | Check Number | Department |
| | -99995594 | |
| Hire Date | Check Date | Team |
| 10/18/2017 | 1/12/2018 | |

### Earnings | | | | | | Deductions

| Description | Location / Job | Rate | Hours/Pieces | Current | Year To Date | Description | Current | Year To Date |
|---|---|---|---|---|---|---|---|---|
| 1099 Earnings | | 0.00 | 0.00 | 225.00 | 225.00 | Fed (S/0) (0.00) | 0.00 | 0.00 |
| | | | | | | NetPay 62799XXXX | 225.00 | 225.00 |
| Total Earnings | | | 0.00 | 225.00 | 225.00 | Total Deductions | 225.00 | 225.00 |

**NET PAY** 225.00 | **Total Direct Deposits** 225.00 | **Check Amount** 0.00 | 0.00

▽ ─────────── REMOVE DOCUMENT ALONG THIS PERFORATION ─────────── ▽

DO NOT ACCEPT THIS CHECK without confirming presence of Artificial Watermark on back. Other security features are listed on back.

**TrueCoverage LLC**
2400 Louisiana Blvd NE
Bldg 3
Albuquerque, NM 87110

Bank Of America
414 S Matilda Ave, Sunnyvale, CA

35
1210

**Check Date 1/12/2018**     **Check Number  Memo**

$************

**Pay** No Dollars and No Cents

**To the Order of:**
1099
**Monique Dudley**

2108  -99995594
NON NEGOTIABLE

PAY ONLY CTS CTS

_____
Authorized Signature